## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| CLAYTON BRADLEY WILLIAMS, III, | ) ) ) | Civil Action No. 1:25-cv-00276 |
| Plaintiff, | ) ) ) |  |
| v. | ) ) |  |
| PENNYMAC LOAN SERVICES, LLC, | ) ) ) ) |  |
| Defendants. | ) |  |

## INTRODUCTION

1. Plaintiff, on behalf of himself and all others similarly situated, alleges violations of the North Carolina Debt Collection Act (NCDCA) and the North Carolina Unfair and Deceptive Trade Practices Act (NCUDTPA) against Defendant PennyMac Loan Services. ("PennyMac").

2. Defendant PennyMac is a large servicer of residential mortgages. PennyMac routinely violates North Carolina law by charging and collecting illegal processing fees when residential mortgage borrowers pay their monthly mortgage by phone or online ("Pay-to-Pay Fees"). PennyMac illegally charges homeowners fees up to $6.75 for each such payment.

3. The NCUDTPA makes Pay-to-Pay fees deceptive and unfair. Additionally, the NCDCA forbids PennyMac from collecting any part of its fee or charges for services rendered. And it further prohibits DMI from collecting incidental fees and charges unless legally entitled. As Pay-to-Pay fees are not expressly authorized in the borrowers'

1

standard mortgage agreements ("Uniform Mortgages"), and are not permitted by any law, PennyMac violates the NCDCA by charging them.

4.     A substantial amount of PennyMac's Pay-to-Pay Fee is marked-up profit because it costs servicers like PennyMac $0.50 or less per transaction to accept payment over the phone. Here, PennyMac pockets the difference between the amount paid by borrowers and the actual expense it pays. This is up to $6.25 overcharge per transaction paid by class members.

5.     Despite its uniform contractual obligations to charge only fees explicitly allowed under the Uniform Mortgages and applicable law, PennyMac leverages its position of power over homeowners and demands exorbitant Pay-to-Pay Fees. Even if some fees were allowed, the mortgage uniform covenants and applicable law only allow PennyMac to pass along the actual costs of fees incurred to it by the borrowers–here, only a few cents per transaction.

6.     Plaintiff Clayton Bradley Williams, III paid these Pay-to-Pay Fees and brings this class action lawsuit individually and on behalf of all similarly situated putative class members.

## JURISDICTION

7.     This Court has subject matter jurisdiction under 28 U.S. Code § 1332(d) because complete diversity exists between PennyMac and at least one member of the proposed class and the matter in controversy exceeds $5,000,000. PennyMac services an estimated 1 million loans nationwide and collects Pay-to-Pay Fees from the class alleged that are believed to be in an amount that exceeds $5 million.

8. This Court has personal jurisdiction because PennyMac transacts business in North Carolina and commits torts in the North Carolina, as described in this Complaint.

9. Venue is proper because PennyMac has conducted business and committed torts in this District as described in this complaint.

## PARTIES

10. The Plaintiff, Clayton Bradley Williams, III, resides in the state of North Carolina.

11. PennyMac Loan Services, LLC (hereinafter "PennyMac") is a corporation having its principal place of business in a state other than North Carolina, but which does business in North Carolina.

## FACTUAL BACKGROUND

### I. APPLICABLE LAW

**North Carolina Debt Collection Act ("NCDCA")**

12. The NCDCA offers broad protection to consumers from underhanded methods used by unscrupulous creditors and debt collectors. It applies broadly.

13. The NCDCA defines "debt collector" as "any person engaging, directly or indirectly, in debt collection from a consumer. N.C. Gen. Stat. § 75-50(3).[1] It allows recovery against both creditors collecting debts in their own names, and those whose

---

[1] The statute does not apply to collection agencies, however, which are subject to the North Carolina Collection Agency Act ("NCCAA"), N.C. Gen. Stat. § 58-70-1 to -155. Based on the information known to Plaintiff as of the filing of this complaint, Defendant is not a "collection agency" within the meaning the NCCAA, as they have not purchased delinquent debt. Plaintiff will amend to add claims under the NCCAA if discovery reveals that Defendant is in fact a collection agency.

primary business is debt collection via loan servicing.

14.     A "consumer" under the NCDCA is "any natural person who incurred a debt or alleged debt for personal, family, household or agricultural purposes." N.C. Gen. Stat. § 75-50(1).

15.     A "debt" under the NCDCA is "any obligation owed or due or alleged to be owed or due from a consumer." N.C. Gen. Stat. § 75-50(2).

16.     The NCDCA prohibits "debt collectors" from "[c]ollecting or attempting to collect from the consumer all or any part of the debt collector's fee or charge for services rendered [or] any interest or other charge, fee or expense incidental to the principal debt unless legally entitled to such a fee or charge."  N.C. Gen. Stat. § 75-55(2). Seeking to collect a debt that includes a Pay-to-Pay Fee violates this provision of the NCDCA.

**North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA")**

17.     The NCUDTPA broadly prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce. *See* N.C. Gen. Stat. § 75-1.1. Seeking to collect a debt that includes a Pay-to-Pay Fee violates this provision of the NCUDTPA. A violation of the NCDCA is also a per se violation of the NCUDTPA.

## II.     FACTUAL ALLEGATIONS

### A.     PennyMac Is Retained by Mortgage Lenders to Service and Collect Mortgage Debt.

18.     PennyMac is a loan servicer that operates around the country.  PennyMac buys mortgage servicing rights or contracts to sub-service mortgage servicing with a primary servicer and exercises those mortgage servicing rights to collect mortgage payments, charge authorized fees, enforce the mortgage or deed of trust and note, and

initiate foreclosure on properties that secure the mortgage or deed of trust and note. PennyMac does not disclose the terms of its servicing agreements publicly.

19. PennyMac enters into service agreements with lenders, primary servicers, note holders, and trustees pursuant to which PennyMac provides servicing, sub-servicing and agency activities for loan portfolios. In accordance with those agreements, PennyMac is compensated by the lenders, note holders, and trustees to act as their agent and to exercise their rights and responsibilities pursuant to their approval. PennyMac either takes assignment of the servicing obligations in borrowers' loan agreements, and/or is in functional privity and near privity of contract with Plaintiff and Class members, tasked with performing many of the obligations assumed by the lenders to Plaintiff's and Class members' loan agreements.

### 1. Overview of the Mortgage Industry and Its Standardized Lending Practices

20. The residential mortgage lending industry is generally divided between two types of loans. The vast majority of loans are "conforming" loans that "conform" with particular uniform terms, conditions, and amounts under a certain threshold set by the Federal Housing Finance Agency in coordination with Federal National Mortgage Association ("FNMA" or "Fannie Mae") and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"). FNMA and FHLMC are federally chartered corporations and are known as Government-Sponsored Enterprises ("GSEs"). In 2024, that funding threshold was $776,550 in many places, and up to $1,149,825 in higher cost-of-living areas. Loans that do not conform to these standards are typically "jumbo" loans and require more specialized underwriting due to the higher value of the property securing the mortgage.

21.     Conforming loans include both government loans (*i.e.*, those insured by the Federal Housing Administration, Veterans' Administration, or the U.S. Department of Agriculture), and conventional loans.   Conforming loans must "conform" to the nationwide standards set by the GSEs, which purchase them to sell as pooled securities in the secondary market.   To ensure ease of securitization, the GSEs create standard mortgage and deed of trust templates for all conventional loans, and the government agencies' templates are modeled after those GSE templates.   While these templates contain sections for language that incorporates state requirements, this process too contains standardized language.

22.     Because the conforming lending process depends on standardization, all borrowers go through the same process to obtain a conforming loan.   Mortgage lenders typically use industry software to generate the standardized templates and complete the templates with the borrowers' information.   Once approved to borrow the funds, the borrowers execute these standard loan documents ("Uniform Mortgages").   Because the GSEs will accept for securitization only those loans that adhere to their standard loan documents, a lender cannot add additional terms and there is no room for negotiation of any kind.

23.     After the mortgage or deed of trust agreement is finalized, the mortgage lender often sells the mortgage loan to the GSEs, who in turn bundle that mortgage loan with other conforming loans to sell as securities to investors in the form of a mortgage-backed security — bond-like securities that are secured by the homes.   While the original mortgage lender may remain to service the securitized and pooled loan, the primary servicer or GSE often retains another servicer or sub-servicer (such as DMI) that

specializes in the actual management and administration of mortgages to perform the servicing obligations required by the Uniform Mortgages.

> **2. Mortgage Lenders and Note Holders Retain Mortgage Servicers Like PennyMac to Accept Payments and Collect Mortgage Debt from Borrowers.**

24.     As part of the contractual or assignment process, the mortgage servicer or sub-servicer and the lender or GSE negotiate a fee schedule to compensate the mortgage servicer or sub-servicer for collecting payments and other servicing and collections work. The borrower has no role in this process.

25.     The fees paid to mortgage servicers or sub-servicers by the lender or GSEs come in a variety of forms. First, mortgage servicers or sub-servicers negotiate a servicing fee, which is typically a percentage of approximately 0.25-0.5% of a borrower's outstanding mortgage balance on an annual basis. The average balance on a mortgage loan in this country was approximately $252,505 in 2024 according to Experian. Thus, if a mortgage servicer agrees to perform work for .5% of the borrowers' balance, and a borrower has a $252,505 balance on the mortgage, the servicer will receive $1,262 a year, or $105.21 per month to accept the payment from the borrower and apply it to the balance. The servicing agreement between the servicer or sub-servicer and lender or GSEs also includes other fee schedules negotiated between those contracting parties and may include things like allowing the holder of the mortgage loans to retain late fees (capped by the GSEs and set in the standardized loan templates) and the ability to retain interest on borrowers' escrow payments.

26.     Consumer borrowers have no say in who their designated loan servicers will be. Nor are they required to pay for loan servicing beyond paying their mortgage and agreed interest.

**B. PennyMac Is a Debt Collector That Charges Pay-to-Pay Fees to Increase Its Profits.**

27.     PennyMac works in interstate commerce, collecting mortgage debt from borrowers nationwide from its headquarters in Illinois. It is registered and licensed as a mortgage servicer, collection agency, debt collector, or similar in states around the country. It is retained by GSEs, note holders, and lenders to collect on mortgage debt pursuant to the terms of the Uniform Mortgages, which contemplate monthly payments (payable on the first of every month). Thus, it is engaged in the regular collection of debt from residential mortgage borrowers.

28.     Each time a mortgage borrower whose loan is serviced by PennyMac makes a loan payment over the phone or uses a debit card ("Pay-to-Pay Transactions"), PennyMac charges the borrowers a Pay-to-Pay Fee of up to $6.75 for using this payment method.

29.     The cost for PennyMac to process the Pay-to-Pay Transactions is well below the amounts charged to borrowers, and PennyMac illegally pockets the difference as profit.

30.     The uniform contractual obligations in the mortgages PennyMac services do not authorize PennyMac to assess Pay-to-Pay Fees. At most, the mortgage uniform covenants ("Uniform Mortgages") allow PennyMac to pass along only the actual cost of fees incurred by it to the borrower.

31.     PennyMac violates its borrowers' Uniform Mortgages when it assesses such fees. PennyMac frequently, intentionally, and persistently collects Pay-to-Pay Fees even though such fees are not authorized by the mortgages, and it therefore had no right to collect them.

8

32.     Uniform Mortgages contemplate the monthly payment of mortgages by check or other electronic payment methods.  Payments by check can cost loan servicers like PennyMac anywhere between $1 to $2 a month in processing and other fees, per 2022 report by the Association for Financial Professionals.  Every check needs to be opened, reviewed, keyed into the computer system to apply to the loan, and deposited.  Delays in postal operations and the high risk of human error generate customer service calls and require internal checkpoints and increased oversight. Borrowers who are concerned about the timeliness of the payment may call to ensure it was received and properly credited, adding to the customer service work associated with this routine part of servicing.  Because it is so expensive to process check transactions, every mortgage servicer in the country offers borrowers the option of having their monthly payment automatically debited via the ACH system.  While offered under the auspice of improving services for borrowers, the cost of an ACH transaction is typically only few cents and its electronic nature reduces overhead costs enormously.

33.     Still, for many borrowers, the automatic ACH system is impractical as it requires a borrower to agree to a fixed amount and date for the debit each month out of a pre-determined bank account and increases a borrower's vulnerability to banking errors. Borrowers may have budgetary needs or personal preferences that cause them to want more control over their finances. Some may wish to choose their payment method on a monthly basis.  Others may be sharing responsibility for paying the mortgage with another person, and funds to pay it come from multiple bank accounts.

34.     To reduce the expense caused by borrowers who pay as required but prefer more control than the automatic ACH option provided to them, many servicers offer to borrowers the option to pay by phone or online.  This option typically costs servicers less

9

than 50 cents a transaction, far less than the cost of paying by check, and like the automatic ACH method, includes increased electronic efficiencies.

35.     Because the cost savings is so significant, most mortgage servicing companies, as well as third-party debt collectors, allow consumers to make their mortgage payments over the phone or online, and many loan servicers offer these services for free. While phone and online payment methods are marketed as convenient for consumers, they are more cost-effective for the servicers over accepting paper checks. Thus, mortgage servicers find their profits increase substantially by simply increasing choices to customers.

36.     Each time a borrower whose loan is serviced by PennyMac makes a payment over the phone, DMI charges the borrower a Pay-to-Pay Fee of up to $6.75.

37.     These Pay-to-Pay Fees are materially higher than the costs incurred by PennyMac, can add up to hundreds of dollars over the life of a single loan, and provide millions of dollars in profits for PennyMac. Typically, a loan servicer will use a vendor to process transactions; these third-party vendors, such as Western Union and ACI Worldwide, charge other loan servicers $0.50 or less per internet or phone transaction. The 2022 Association for Financial Professionals report states that the median cost for processing these transactions was between 26 and 50 cents, much less than its estimated check processing costs.

38.     PennyMac's imposition of Pay-to-Pay Fees also amounts to double-charging. Thus, to build on the example in Paragraph 25 above, where PennyMac hypothetically negotiated a 0.5% servicing fee, PennyMac agreed to receive that rate regardless of how the borrower elects to pay, knowing that it was obligated to accept payments via check from every borrower. Thus, out of the $105.21 it receives each month

10

out of the loan payment being made by the borrower, it could incur as much as $2 in costs to process check payments, leaving $103.21 to cover other overhead costs and for its profit. PennyMac double charges borrowers by charging additional Pay-to-Pay Fees, up to $6.75 for each payment, over and above PennyMac's negotiated servicing fees agreed with the lender, GSE or primary servicer.

39. PennyMac purports to be providing a valuable service to borrowers to which they would not otherwise be entitled. But many mortgage servicers offer online and phone payments for free because of the cost savings to them when borrowers pay via these methods as opposed to by paper check. Thus, providing the service is not contingent on being able to charge for the service. Further, borrowers already pay PennyMac to service their loans by paying their mortgages. If PennyMac wants to make more money, it can negotiate a larger fee from the lender, primary servicer or GSE. It should not be permitted to double dip – pocketing the servicing cut, while up-charging borrowers for the same.

40. The Pay-to-Pay Fees materially exceed the costs incurred by PennyMac to process the phone payments, providing millions of dollars in unlawful profits for PennyMac.

41. PennyMac gets away with these illegal Pay-to-Pay Fees because borrowers cannot choose another mortgage servicer or shop around for a better deal. Borrowers are forced to have PennyMac as their loan servicer.

### C. PennyMac's Pay to Pay Fees Are Oppressive, Substantially Injurious to Consumers, and Violate Public Policy.

42. As discussed herein, Pay-to-Pay Fees have earned condemnation from borrowers, federal and state legislatures, regulators, and attorneys general. Because of this, PennyMac is one of a dwindling minority of mortgage servicers still charging these fees.

43.     The federal government and state governments have issued statements condemning Pay-to-Pay Fees and prohibiting loan servicers and debt collectors from assessing them.

44.     In October 2022, President Biden announced that his administration would be taking steps to go after unfair "junk fees" such as Pay-to-Pay Fees. Around that time, the FTC announced that it was seeking comments on "junk fees," the "unnecessary, unavoidable, or surprise charges that inflate costs while adding little to no value." https://www.ftc.gov/news-events/news/press-releases/2022/10/federal-trade-commission-explores-rule-cracking-down-junk-fees (last accessed Feb. 1, 2023). Among the junk fees on which the FTC sought commentary were those imposed on "captive consumers," such as those who are dealing with a company that has "exclusive rights." *Id.* Chair Lina M. Khan explained that:

> No one has ever felt that a 'convenience fee' was convenient. Companies should compete to provide the best quality at the best price, not to see who can squeeze the most added expenses out of consumers. That's especially true at a time when families are struggling with the effects of inflation.

*Id.*

45.     The CFPB has been taking steps to address junk fees like Pay-to-Pay Fees. In June 2022, it issued an advisory opinion in which it "affirm[ed]" its position that imposition of "pay-to-pay or 'convenience' fees, such as fees imposed for making a payment online or by phone," where those fees are not contractually or legally authorized, is an "unfair or unconscionable means to collect or attempt to collect any debt" prohibited by Section 808(1) of the FDCPA and the CFPB's regulations implementing that provision. *See* Ex. F.

46. This advisory opinion comes on the heels of other efforts by the CFPB to respond to the problems caused by Pay-to-Pay Fees. In October 2021, the CFPB, filed an *amicus* brief in a matter before the Ninth Circuit agreeing that the FDCPA prohibits the charging of any amount not expressly authorized by the agreement creating the debt or otherwise affirmatively permitted by state law. The CFPB explained:

> The FDCPA was designed to rein in unethical debt collectors, and Section 1692f(1) specifically was designed to limit the amounts that debt collectors could try to collect from consumers. But under the district court's interpretation, debt collectors can collect additional fees, like the pay-to-pay fees at issue here, whenever no other law specifically prohibits them—leaving debt collectors with the power and discretion to try to collect additional fees during the collection process. This is particularly problematic given that consumers have no ability to shop around for a better deal. And it's not as if these pay-to-pay fees are necessary for debt collectors to offer phone or online payment options that consumers might want, as it is generally cheaper for collectors to accept payment by phone or online than to accept payment by mail (which is typically the fee-free option). Pay-to-pay fees are thus most often just a way for debt collectors to take advantage of consumers by trying to extract more money than they originally bargained for or reasonably expected to pay.

*Thomas-Lawson v. Carrington Mort. Servs.*, 9th Cir. No. 21-55459, Dkt. 22 (Brief of Amicus Curiae Consumer Financial Protection Bureau in Support of Plaintiffs-Appellants) at 11.

47. The CFPB's position on Pay-to-Pay Fees is not new. In 2017, the CFPB put out a bulletin on "Phone Pay Fees," in which it warned financial services providers and debt collectors about the many ways in which their fees for making payments over the phone could violate laws. In the bulletin, the CFPB expressly warned mortgage servicers that this practice might violate the FDCPA, stating:

> Supervision has found that one or more mortgage servicers that met the definition of "debt collector" under the FDCPA

13

violated the Act when they charged fees for taking mortgage payments over the phone to borrowers whose mortgage instruments did not expressly authorize collecting such fees and who reside in states where applicable law does not expressly permit collecting such fees. Supervision directed one or more servicers to review mortgage notes and applicable state law, and to only collect pay-by-phone fees where expressly authorized by contract or state law.

Source: https://files.consumerfinance.gov/f/documents/201707_cfpb_compliance-bulletin-phone-pay-fee.pdf ("CFPB 2017 Bulletin").

48. State regulators have also taken action. In April 2022, in response to the CFPB's request for information on this issue, Josh Stein, then the Attorney General of North Carolina, joined a coalition of 22 state attorneys general to call on the CFPB to prohibit mortgage servicers from charging Pay-to-Pay fees. While the CFPB had asked for information on a broad array of "junk fees" charged by financial service companies, the group submitted comments solely on the Pay-to-Pay Fees charged by mortgage servicers. *See* Ex. A, Attorney Generals' Response dated April 11, 2022. The group noted that the fees are particularly problematic in this specific context, explaining "And since mortgage borrowers are a captive market for their particular servicer, borrowers can't simply avoid the fees by taking their business elsewhere." *Id.* at 2. Speaking about his reasoning for joining the charge, Former Attorney General Stein stated, "Mortgage servicers set convenience fees at will to excessively profit off homeowners, and homeowners are stuck with them." He went on to say, "I'm pleased that the CFPB is seeking to learn more about how excess fees harm North Carolinians, and I hope it will take action to put an end to these exploitative costs." *See* https://ncdoj.gov/attorney-general-josh-stein-calls-on-cfpb-to-protect-consumers-from-mortgage-servicing-convenience-fees/, last accessed March 19, 2024.

49.     Similarly, in 2021, a coalition of 33 state attorneys general, including from North Carolina, intervened to object to a settlement with another large mortgage servicer, when the terms of that agreement purported to permit the servicer to force borrowers to modify their Uniform Mortgages to allow it to assess Pay-to-Pay Fees.  Former North Carolina Attorney General Stein, speaking about the matter, condemned the fees as unlawful, stating the mortgage servicer "profited for years off illegal fees at the expense of North Carolinians who were simply paying their mortgage loans on time and upholding their end of their mortgage contracts…Now, this settlement would allow them to continue to profit off of these fees at a time when so many North Carolinians are struggling to make ends meet. This settlement is unlawful, and I'll do everything in my power to fight it." Source:     https://ncdoj.gov/attorney-general-josh-stein-fights-to-protect-nearly-one-million-homeowners/ (March 19, 2024).

### D.     Plaintiff's Allegations

50.     Plaintiff Williams owns property in North Carolina that is secured by a mortgage and Deed of Trust. Plaintiff's mortgage loan is secured by his property for personal, family, or household uses. A copy of Plaintiff's Deed of Trust is attached as Exhibit A.

51.     PennyMac is the servicer for Plaintiff's mortgage.

52.     In May 2024, Plaintiff paid his mortgage over the telephone and was charged a $6.75 Pay-to-Pay Fee by PennyMac.

53.     The Mortgage Agreement does not authorize Pay-to-Pay Fees. Rather, it states that the "Lender may not charge fees that are expressly prohibited by this Security Agreement or by Applicable Law." The Mortgage Agreement defines Applicable Law as "all controlling applicable federal, state, and local statutes, regulations, ordinances and

15

administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions."

54.     PennyMac's collection of the Pay-to-Pay Fees violated the NCDCA and NCUDTPA because the mortgage agreement does not expressly allow PennyMac to charge Pay-to-Pay Fees, and PennyMac's collection was an attempt to charge Plaintiff for PennyMac's services and costs. Nevertheless, PennyMac collected these fees as though they were allowed, failing to disclose that the fees were not authorized. PennyMac also failed to disclose that these fees were not the actual cost of the transaction incurred by PennyMac. The collection of these fees was an unfair and deceptive trade practice.

55.     PennyMac acted unfairly, illegally, and deceitfully by assessing Plaintiff more in Pay-to-Pay Fees than it actually disbursed to process to Pay-to-Pay Transactions.

**E.      PennyMac Has Been Repeatedly Informed of the Wrongful and Illegal Nature of its Pay-to-Pay Fees.**

56.     PennyMac has been duly and adequately notified and informed that it is in violation of state and federal law, as well as in breach of contract and violates other state common laws, with borrowers in N.C.

57.     On February 21, 2025, prior to filing this Complaint, Mr. Williams made a written pre-suit demand upon PennyMac on behalf of similarly situated borrowers, mailing it by first class mail. Specifically, Mr. Williams informed PennyMac that the Pay-to-Pay fees are unlawful. A copy of that notice is attached hereto as Exhibit B.

58.     PennyMac was given a reasonable opportunity to cure the breaches complained of herein, but has failed to do so. Despite receiving this notice, PennyMac has refused to remedy its violations as to Class Members. Further notice would be futile.

59.     In addition to the pre-suit notices provided by Plaintiff, PennyMac has long been aware that its assessment of Pay-to-Pay Fees is illegal but has refused to make modifications.

60.     PennyMac was aware of state and federal regulators' statements and positions on Pay-to-Pay Fees. Indeed, as a mortgage servicer, PennyMac would have received and read the CFPB 2017 Bulletin in Paragraph 98, and been on notice that its Pay-to-Pay Fees were illegal and violated federal debt collection law. PennyMac would also be aware of the various statements and actions by regulators described in Section IV.B.3.

61.     Moreover, by virtue of its role as a mortgage servicer, PennyMac would have been aware of the many lawsuits against mortgage loan servicers over the charging of Pay-to-Pay Fees. Over the last six years, numerous class action lawsuits were filed against nearly every major mortgage loan servicer in multiple states, including Nationstar Mortgage LLC, Ocwen Loan Servicing, LoanCare LLC, and Caliber Home Loans. PennyMac was also the defendant in at least one such suit.

62.     Thus, at the time Plaintiff provided notice to PennyMac in February 2025, PennyMac had been notified that its practice of charging Pay-to-Pay fees violated state and federal laws and public policy, as well as other legal duties and obligations. PennyMac had been informed not only by Plaintiff, but had extensive information available to it via its role as a servicer to understand the full extent of the illegality of its fee practices. PennyMac nevertheless declined to cure.

63.     Indeed, PennyMac still charges the Pay-to-Pay Fees and has declined its opportunity to cure the imposition of those fees.

64. Given PennyMac's multi-year refusal to cure, pre-suit notice from Plaintiff or any absent class member would have be futile and would stand as an unreasonable barrier to the enforcement of their contractual and statutory rights.

**F.      Unlawfully Serviced Plaintiff's Loan**

65. In addition to its unlawful fees, PennyMac's loan servicing also violated Mr. Williams' individual mortgage.

66. Mr. Williams closed on the home in July 2023 and moved into the home in the fall of 2023.

67. Due to the mold condition of the home, Mr. Williams was unable to live the home.

68. Nonetheless, Mr. Williams continued to make payments on the home through September 2024 while attempting to secure funding to remediate the mold to make the home habitable.

69. Mr. Williams requested financial assistance from PennyMac.

70. Mr. Williams advised PennyMac that he was not living in the home due to the mold condition.

71. PennyMac advised Mr. Williams to stop making payments on his loan in order to evaluate him for a loan modification.

72. Mr. Williams relied on the advice of PennyMac and stopped making payments on his home loan.

73. PennyMac later refused to offer a loan modification to Mr. Williams because he was not residing in the home.

74. Mr. Williams relied on PennyMac to his detriment.

75. Nearly five months later, PennyMac offered a streamline loan modification.

76. This modification offer was too late to allow Mr. Williams to repair the home, which had continued to deteriorate due to PennyMac's refusal to offer a similar modification when Mr. Williams requested.

77. Plaintiff mailed PennyMac, via his attorney, a notice that he was represented by counsel on February 24, 2025.

78. PennyMac acknowledged receiving this notice on February 26, 2025, via a letter mailed to Plaintiff.

79. Thereafter, PennyMac continued to communicate directly with Plaintiff instead of via his counsel by phone, by email, and by mail.

## CLASS ACTION ALLEGATIONS

80. Plaintiff brings this action under Fed. R. Civ. P. 23 on behalf of the following classes of persons, subject to modification after discovery and case development:

> **The Class**: All persons (1) with a residential mortgage loan securing a property in the North Carolina, (2) serviced or subserviced by PennyMac, (3) and who paid a Pay-to-Pay Fee when making a payment on their mortgage to PennyMac by telephone, internet, or an Interactive Voice Response system ("IVR") during the applicable statutes of limitations through the date a class is certified.

81. Class members are identifiable through Defendant's records and payment databases.

82. Excluded from the classes are the Defendant; any entities in which it has a controlling interest; its agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

83. Plaintiff proposes that she be appointed as class representatives.

84. Plaintiff and the Classes have all been harmed by the actions of Defendant.

85. Numerosity is satisfied. Upon information and belief, there are thousands

19

of class members.  Individual joinder of these persons is impracticable.

86.     There are questions of law and fact common to Plaintiff and the Class, including, but not limited to:

> **a.** Whether PennyMac violated state law by charging Pay-to-Pay Fees not due;
>
> **b.** Whether PennyMac violated state law by charging Pay-to-Pay Fees not due and unreasonable;
>
> **c.** Whether PennyMac's costs of the Pay-to-Pay Transactions are less than the amount it charged for Pay-to-Pay fees;
>
> **d.** Whether Plaintiff and the Class members are entitled to injunctive relief;
>
> **e.** Whether Plaintiff and the Class Members are entitled to actual and/or statutory damages as a result of Defendant's actions; and
>
> **f.** Whether Plaintiff and the Class are entitled to attorney's fees and costs.

87.     Plaintiff's claims are typical of the claims of class members.  PennyMac charged Plaintiff Pay-to-Pay Fees in the same manner as the Class Members.  Plaintiff and the Class Members entered into Uniform Mortgages in their Mortgage Agreements that prohibit Pay-to-Pay charges.  Alternatively, if PennyMac is allowed under the Uniform Mortgages to charge Pay-to-Pay Fees, such amount is capped at the actual amounts disbursed by PennyMac to process the Pay-to-Pay Transactions.

88.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members and she will fairly and adequately protect the interests of the Class.  Plaintiff has taken actions before filing this Complaint, by hiring skilled and experienced counsel, and by making a pre-suit demand on behalf of class members to protect the interests of the class.

89.     Plaintiff has hired counsel that is skilled and experienced in class actions

and are adequate class counsel capable of protecting the interests of the class members.

90.     Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of this controversy.

91.     The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF THE NORTH CAROLINA DEBT COLLECTION ACT**
**N.C. Gen. Stat. § 75-55(2)**
**On Behalf of Plaintiff Williams and the Class**

92.     All prior and subsequent paragraphs are hereby incorporated by reference.

93.     Plaintiff and the Class Members engaged in consumer transactions when they took out mortgages in order to acquire real property for personal, family, or household uses. Plaintiff took out the mortgage loan secured by his property and now serviced by PennyMac for personal, family, or household uses. *See* N.C. Gen. Stat. § 75-50(1).

94.     The NCDCA defines "debt collector" as "any person engaging, directly or indirectly, in debt collection from a consumer. N.C. Gen. Stat. § 75-50(3). The NCDCA applies to PennyMac because they attempt to collect alleged debts arising out of consumer transactions, when they collect a debt associated with consumer mortgages.

95.     N.C. Gen. Stat. § 75-55(2) prohibits PennyMac from collecting any part of its fee or charge for services rendered. PennyMac violated this provision of the NCDCA as to Plaintiff and the Class when it collected Pay-to-Pay fees when borrowers paid their

21

mortgage online and/or over the phone, as the Pay-to-Pay fees represent a charge for services rendered and/or PennyMac's fee.

96. N.C. Gen. Stat. 75-55(2) further prohibits PennyMac from collecting a "any interest or other charge, fee or expense incidental to the principal debt unless legally entitled to such fee or charge." PennyMac violated this provision of the NCDCA as to Plaintiff and the Class when it collected Pay-to-Pay fees when borrowers paid their mortgage online and/or over the phone, as the Pay-to-Pay fees are a "charge, fee or expense" incidental to the mortgage debt and related payment, and PennyMac was not legally entitled to such fee or charge.

97. PennyMac knew that the Mortgage Agreements of Plaintiff and the Class Members did not expressly authorize PennyMac to collect Pay-to-Pay Fees, and that PennyMac did not have a right to collect the fees or charges they paid to third parties, such as Western Union, for Pay-to-Pay services rendered. PennyMac also knew that the Pay-to-Pay fees charged were unauthorized charges, fees, or expenses that were incidental to the underlying debt. PennyMac knew that it was collecting more than the cost to process the Pay-to-Pay Transactions when it collected the Pay-to-Pay Fees. Despite this knowledge, PennyMac represented to Plaintiff and the Class Members that they had the right to collect Pay-to-Pay Fees and collected them from Plaintiff and the Class Members.

98. As a result of PennyMac's violations of the NCDCA, Plaintiff and the Class Members were harmed. They are entitled to actual damages, plus statutory damages of not less than five hundred dollars ($500.00) nor greater than four thousand dollars ($4,000) for each violation of N.C. Gen. Stat. § 75-56, as well as reasonable attorneys' fees and costs.

## COUNT II

**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**N.C. Gen. Stat. §75-1.1**
**On Behalf of Plaintiff Custer and the North Carolina Class**

99.     All prior and subsequent paragraphs are hereby incorporated by reference.

100.     PennyMac engaged in "commerce" as defined by N.C. Gen. Stat. § 75-1.1 when they attempted to collect, and collected, a debt associated with mortgage payments.

101.     PennyMac violated the NCUDTPA under N.C. Gen. Stat. § 75-1.1 when they engaged in unlawful, unfair, and deceptive practices in trade or commerce by taking advantage of consumers in claiming and collecting amounts not owed.

102.     **PennyMac violated the NCUDTPA's prohibition on deceptive practices,** as PennyMac never informed Plaintiff that (1) the actual cost to PennyMac for the Pay-to-Pay Fee was less than the amount charged to Plaintiff and (2) the collection of the Pay-to-Pay Fee was not allowed under his deed of trust.

103.     **PennyMac violated the NCUDTPA's prohibition on unfair practices** because its Pay-to-Pay Fees offend public policy, are immoral, unethical, oppressive, or unscrupulous, and/or cause substantial injury to consumers.

104.     PennyMac's use of its exclusive position as the mortgage servicer for captive borrowers like Plaintiff and Class to impose Pay-to-Pay Fees to which it is neither entitled by law to add nor expressly authorized by the Uniform Mortgages constitutes a "unfair" business practice because, as alleged above, it offends established federal and state public policy, is immoral, unethical, oppressive, or unscrupulous, and have resulted in substantial injuries to consumes.

105.     The State of North Carolina's actions in various contexts demonstrate that Pay-to-Pay Fees offend established public policy. For example, Former Attorney General

Stein has condemned such fees as illegal and unfair on various occasions. And the state has enacted laws such as the NCDCA, which prohibits debt collectors from collecting portions of their fees. Federal public policy also disfavors Pay-to-Pay Fees. This policy is reflected in, among other things, CFPB statements and advisory opinions, the statements of the executive branch, and Congress's prohibition in the FDCPA on debt collectors assessing Pay-to-Pay Fees.

106. Conduct is oppressive when it leaves a consumer with little alternative except to submit to it, and the consumer cannot avoid the defendant's practice by seeking an alternative elsewhere. PennyMac's conduct is oppressive because borrowers cannot choose another loan servicer or shop around for a better deal to avoid its imposition of unlawful Pay-to-Pay Fees. Borrowers are forced to have PennyMac as their loan servicer as a result of the unilateral decision of their lender or holder of their note. If Plaintiff and Class Members had their choice, they would select one of the many other mortgage servicers that do not charge a fee for a standard telephonic payment.

107. PennyMac's unfair practices are substantially injurious to consumers, who were and are forced to pay these Pay-to-Pay Fees each time they make payments by phone. In aggregate, the charging of these illegal fees has resulted in millions of dollars of harm to North Carolina borrowers.

108. There is no countervailing benefits to consumers or competition that outweighs the harm suffered by Plaintiff and the Class. PennyMac charges fees well above the actual cost of providing online and phone payment services, and doing so gives PennyMac an unfair advantage over its competitors who do not charge the unlawful fees. If PennyMac could not charge Pay-to-Pay fees, it would still offer to consumers the option to pay by phone and/or online, as the costs to PennyMac are significantly cheaper than

processing a check payment. The unlawful profit center gives DMI the opportunity to undercut its competitors by accepting a lower servicing fee, providing more robust services for the same servicing fee, distributing more dividends to its shareholders, or any combination thereof. This will incentivize competitors to engage in a race to the bottom to reduce costs – likely in the form of the reducing the number of employees, or decreasing or delaying technological investment -- or increase their revenue by instituting their own unlawful fees. Either scenario, or combination thereof, is detrimental to consumers and competition.

109. **PennyMac violated the NCUDTPA's prohibition on illegal practices**, as PennyMac violated the NCDCA, as set forth in Count I. The NCDCA was enacted to prohibit unfair and deceptive acts within the debt collection and servicing industries. Thus, by violating the NCDCA, there is a per se violation of the NCUDTPA.

110. As a result of DMI's NCUDTPA violations, Plaintiff and the Class suffered substantial damage, including but not limited to financial damage incurred from PennyMac's unlawful Pay-to-Pay Fees.

111. To the extent required, this cause of action is being pled in the alternative.

**COUNT III**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**N.C. Gen. Stat. §75-1.1**
**On Behalf of Plaintiff Williams Individually**

112. All prior and subsequent paragraphs are hereby incorporated by reference.

113. Defendant committed *per se* and general unfair or deceptive acts or practices in the servicing of Plaintiff's loan, including, but not limited to, the following:

25

a. Failing to comply with Plaintiff's request for information about the home loan account and to respond to any dispute initiated by the borrower about the loan account in violation of N.C. Gen. Stat. § 45-93;

b. Failing to "[a]ct with reasonable skill, care, and diligence" in violation of N.C. Gen. Stat. § 53-244.110(3);

c. Failing to "to negotiate with the borrower, subject to the mortgage servicer's duties and obligations under the mortgage servicing contract, if any, to attempt a resolution or workout to the delinquency" in a reasonable manner in violation of N.C. Gen. Stat. § 53-244.110(7);

d. engaging in "any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person in connection with the ...servicing of any mortgage loan" in violation of N.C. Gen. Stat. § 53-244.111(8); and

e. failing to "comply with applicable State and federal laws and regulations related to mortgage lending or mortgage servicing" in violation of N.C. Gen. Stat. § 53-244.111(14).

114.    As a result of the Defendant's actions, Plaintiff accrued significant interest on his mortgage loan while Defendant failed to timely and diligently process his loan modification application.

115.    Defendant's unfair and deceptive acts or practices affected commerce related to Plaintiff's loan in violation of N.C. Gen. Stat. § 75-1.1.

116.    As a result of the Defendant's actions, Plaintiff has been annoyed, inconvenienced, harassed, bothered, upset, angered, suffered significant out-of-pocket loss, and otherwise caused indignation and distress, including fear of foreclosure.

## COUNT III
## VIOLATION OF THE VIOLATIONS OF NORTH CAROLINA DEBT COLLECTION ACT (NCDCA)
### N.C. Gen. Stat. §75-1.1
### On Behalf of Plaintiff Williams Individually

117.    The Plaintiff incorporates the previous and all following paragraphs as if fully set forth herein.

118.    Defendant received a letter from Plaintiff's attorney stating that Plaintiff was represented.

119.    Nonetheless, Defendant continued to communicate directly with Plaintiff.

120.    Defendant committed *per se* and general unfair or deceptive acts or practices in the servicing of Plaintiff's loan, including, but not limited to, communicating with a consumer (other than a statement of account used in the normal course of business) whenever the debt collector has been notified by the consumer's attorney that he represents said consumer in violation of *N.C. Gen. Stat.* § 75-55(3).

121.    As a result of the Defendant's actions, Plaintiff has been annoyed, inconvenienced, harassed, bothered, upset, angered, suffered significant out-of-pocket loss, and otherwise caused indignation and distress.

### DEMAND FOR RELIEF

Plaintiff demands from PennyMac on his behalf and on behalf of all those similarly situated:

1.    An order certifying the proposed class pursuant to Federal Rule of Civil Procedure 23 and appointing Plaintiff and his counsel to represent the class;

27

2. Monetary and/or equitable relief in an amount to be determined at trial, including that the Plaintiff be awarded damages against the Defendants, in an amount to be determined at trial, that fairly and reasonably compensate Plaintiff for moneys lost as a result of Defendant's unlawful acts;

3. That Plaintiff be awarded additional damages against the Defendant, in an amount to be determined at trial, that fairly and reasonably compensate Plaintiff for emotional and mental distress, loss of use, aggravation, anxiety, annoyance and inconvenience suffered as a result of the Defendant's unlawful acts;

4. That Plaintiff be awarded consequential and incidental damages against the Defendant in an amount to be determined at trial;

5. Statutory damages and/or penalties, including treble damages;

6. Punitive or exemplary damages;

7. Pre- and post-judgment interest to the extent provided by law;

8. Attorneys' fees and costs of suit, including costs of notice, administration, and expert fees; and

9. Such other legal or equitable relief, including injunctive or declaratory relief, as the Court may deem appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

> **CLAYTON BRADLEY**
> **WILLIAMS, III,**
> **ON BEHALF OF HIMSELF AND**
> **ALL OTHERS SIMILARLY SITUATED**
> BY COUNSEL

BY: **/s/ Benjamin M. Sheridan**
       Benjamin M. Sheridan (# 52734)

Case 1:25-cv-00276-ICB-LPA    Document 1    Filed 04/09/25    Page 28 of 29

Jed R. Nolan (# 56899)
*Counsel for Plaintiffs*
Klein & Sheridan, LC PC

**Mailing Address:**
964 High House Rd. PMB 2039
Cary, NC  27513

**Physical Office:**
2500 Regency Parkway
Cary, NC  27518

ben@kleinsheridan.com
jed@kleinsheridan.com
phone: (919) 899-9533
fax : (919) 899-9533

James L. Kauffman*
**BAILEY & GLASSER, LLP**
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101
jkauffman@baileyglasser.com

Bart D. Cohen*
**BAILEY & GLASSER, LLP**
1622 Locust Street
Philadelphia, PA 19103
(215) 274-9420
bcohen@baileyglasser.com

Katherine M. Aizpuru*
Robin Bleiweis*
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave., NW
Suite 1010
Washington, DC 20006
(202) 973-9000
kaizpuru@tzlegal.com

*Pro hac vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*

29